DOVE LEWIS MEMORIAL EMERGENCY
VETERINARY CLINIC, INC.,
*Appellant,*

*v.*

DEPARTMENT OF REVENUE,
STATE OF OREGON,
*Respondent.*

(TC 2086; SC S31597)

723 P2d 320

Kirkham E. Hay, Portland, argued the cause and filed the brief for appellant.

Dave L. Canary, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices, and Gillette, Justice Pro Tem.

GILLETTE, J.

## GILLETTE, J.

Taxpayer, Dove Lewis Memorial Emergency Veterinary Clinic, Inc., appeals from a judgment of the Oregon Tax Court denying its claim to a real property tax exemption for the tax year 1981-82. 10 OTR 33 (1985). The Tax Court ruled that taxpayer was not entitled to the exemption because it did not qualify as a charitable corporation. Pursuant to ORS 305.445, we review anew upon the record to determine whether taypayer is a charitable corporation and thereby eligible for the tax exemption. We agree that it is not eligible and therefore affirm.

The relevant facts are as follows: In 1965, a group of Portland area veterinarians who were members of the Portland Veterinary Medical Association (PVMA) attempted to provide an emergency service for the treatment of small animals. The service was available after the veterinarians' normal hours of operation; participating veterinarians volunteered their services and agreed to share on-call responsibilities. The system proved to be inefficient due, in large part, to the refusal of some members to respond to calls.

During the ensuing years, one of taxpayer's eventual founders, Dr. Werner, discussed the prospect of forming an emergency clinic with other local veterinarians but could not generate enough interest or financial backing. However, in 1973, a local dog breeder named Lewis contacted Werner and offered to donate a sum of money to start up the clinic as a memorial to his late wife.

Taxpayer was formed under ORS chapter 61 as a nonprofit organization. The Internal Revenue Service granted it nonprofit status on February 26, 1974, exempting it from federal income tax under Section 501(c)(3) of the Internal Revenue Code.

Taxpayer operated its clinic out of a rented building in downtown Portland for approximately seven years, realizing a profit in each year. In 1980, it purchased the subject property and facility with funds derived in part from the net revenues received in the preceding seven years of operation. A small but undetermined amount was made up of donations. Most of the funds, however, came from a loan obtained from a bank.

Taxpayer currently employs a full-time staff consisting of five veterinarians, eight technicians, one secretary and one business administrator. All are paid salaries comparable to persons similarly employed at other veterinary facilities. Taxpayer is open for business from 6 p.m. to 8 a.m. Monday through Thursday, from 6 p.m. Friday through the weekend, and 24 hours on holidays.

In March, 1981, taxpayer submitted an application pursuant to ORS 307.162[1] to Multnomah County for exemption from property tax. On July 7, 1981, Multnomah County informed taxpayer that its application for exemption from property tax was denied. On appeal to the Department of Revenue, the Department affirmed the Multnomah County Assessor's opinion and denied taxpayer's request for exemption. Taxpayer then filed this case. The Tax Court affirmed the opinion of the Department on February 26, 1985. The present appeal followed.

Taxpayer seeks exemption from payment of ad valorem taxes on its real and personal property pursuant to ORS 307.130, which provides, in pertinent part:

"Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(1)  * * * only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions.

"(2)  Parking lots used for parking or any other use as long as that parking or other use is permitted without charge."

Taxation is the rule and exemption from taxation is the exception. *Corporation of Sisters of Mercy v. Lane Co.,* 123 Or 144, 152, 261 P 694 (1927). The burden of establishing

---

[1] ORS 307.162 provides, in pertinent part:

"Before any real property may be exempted from taxation under ORS 307.127, 307.130 to 307.140, 307.150 or 307.160 for any year, the institution or organization claiming the exemption shall file with the county assessor, on or before April 1 in such year, a statement verified by the oath or affirmation of the president or other proper officer of the institution or organization, listing all real property claimed to be exempt and showing the purpose for which such property is used. * * *"

entitlement to an exemption is on the taxpayer claiming the exemption. *Methodist Homes, Inc. v. Tax Com.,* 226 Or 298, 307, 360 P2d 293 (1961).

Taxpayer's primary contention is that it is a hospital and that the cases considering the eligibility of hospitals to a charitable exemption are controlling. Of course, the mere fact that an organization is either a hospital or a charity does not establish any inherent right to exemption. *Unander v. U. S. Nat'l Bank,* 224 Or 144, 151, 355 P2d 729 (1960); *Corporation of Sisters of Mercy v. Lane Co., supra,* 123 Or at 153; *see Ackerman v. Phys. and Surgeons Hosp.,* 207 Or 646, 660, 288 P2d 1064, 298 P2d 1026 (1956). Any organization claiming the benefit of the tax exemption statute as a "charitable" institution must have charity as its primary, if not sole, object, and must be performing in a manner that furthers that object.

The articles and bylaws of a corporation are prima facie evidence of the character of the corporation. *Found. of Human Understanding v. Dept. of Rev.,* 301 Or 254, 722 P2d 1 (1986) (articles); *Benton Co. v. Allen,* 170 Or 481, 485, 133 P2d 991 (1943) (articles); *Hamilton v. Corvallis Hosp. Ass'n.,* 146 Or 168, 171-72, 30 P2d 9 (1934) (articles and bylaws).

Taxpayer's bylaws state:

> "The primary objective of the Clinic shall be to provide emergency veterinary service for small animals directed primarily to those hours when the private clinics would not be operating and on weekends, and in addition thereto, to provide further educational facilities for the dissemination of literature, library and other facilities and any other lawful purpose as set out in the Articles of Incorporation."

Taxpayer is organized to provide "emergency small animal veterinary service." One of the principal founders of taxpayer testified that it was formed "probably out of frustration more than anything else," referring to the failed attempt to provide an all-volunteer after-hours emergency service. Although taxpayer's expressed purpose is beneficial, we cannot say that it is as a matter of law "charitable," as that term is used in ORS 307.130. Neither, however, do the articles and bylaws eliminate taxpayer as a charity. We turn to a consideration of whether taxpayer's activities are sufficiently charitable to entitle it to exemption.

In determining whether an organization is, by its conduct, charitable, the crucial consideration is the element of a gift or giving.

"This is a sound and salutary rule. It is one reflecting human experience. Unselfish declarations of intended purpose and promises of future worthy endeavor are many times rendered meaningless by inaction and should give the declarer no preferred status unless ultimately resolved into concrete and tangible reality." *Methodist Homes, Inc. v. Tax Com., supra,* 226 Or at 308.

In *Methodist Homes, Inc. v. Tax Com., supra,* this court reviewed the line of "hospital" cases and outlined six factors that are relevant in determining the charitable character of a hospital:

(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;

(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;

(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;

(4) Whether charges are made to all patients and, if made, are lesser charges made to the poor or are any charges made to the indigent;

(5) Whether there is a charitable trust fund created by benevolently and charitably minded persons for the needy or donations made for the use of such persons; and

(6) Whether the institution operates without profit or private advantages to its founders and the officials in charge. 226 Or at 309-10 (Citations omitted). Even after listing these factors, however, this court issued a precautionary note:

"We do not hold that all the foregoing factors must be present before a given institution can be declared one of charitable or noncharitable pursuits. Nor do we say that the list includes all items which may assist in a conclusion respecting the charitable or noncharitable status of a given corporation. The itemization represents only those particulars which have been in the past employed by this court in

discovering if a given hospital is or is not in fact eleemosynary." 226 Or at 310.

In this court's enunciation of the factors to be considered, we noted in *Methodist Homes* that, although all of the factors need not be present, the absence of two factors can negate any claim to exemption. The two factors are the existence of a separate account containing funds and donations committed to charitable use and the absence of profit or private advantage to the organization's founders and officials. 226 Or at 311. On our review of the record, we find no testimony or evidence to indicate whether a fund was established for the original donation by Lewis or for any subsequent funds received by taxpayer to be administered for the benefit of any charitable purpose. The only reference to a fund is that of a "building fund," consisting of monies derived from operating revenue and some donations of an undetermined amount.

Concerning profit and private advantage, witnesses for taxpayer testified that the clinic is a nonprofit corporation, that all receipts generated are put back into the clinic to purchase new equipment and property and to cover operating expenses, that no dividends are declared or bonuses paid to directors or members of the organization and that the organization has no capital stock. Taxpayer therefore asserts that no founders or officials of the corporation derive any profit or private advantage from the clinic. However, the gain, profit, or private advantage derived need not be solely pecuniary. For example, in *Ackerman v. Phys. & Surgeons Hosp., supra,* this court held that a bylaw provision that vested lifetime control in the founders of the corporation and allowed them to designate their successors in a will were "elements of valuable private advantage which a jury might properly consider * * *". 207 Or at 664-65.

Despite taxpayer's contention to the contrary, we find that here, as in *Ackerman,* the operation of its clinic bestowed certain benefits and private advantages on its founders and officials. Taxpayer's business manager testified on direct examination as follows:

"Q.   * * * If an animal comes in and is injured, what happens? What takes place in the Clinic with respect to an animal that comes in that's injured and needs medical care?

"A.   First, we examine it and we discuss with the owner the extent of the injuries and the extent of the work that will need to be done and get permission to treat the animal and if we treat it it depends on the time of the night how long the animal stays. If it has to be watched constantly we will keep it until the next morning.

"Q.   Then what happens to that animal?

"A.   The owner picks up the animal and takes it on to the veterinarian of their choice.

"Q.   Okay, so it's just purely emergency until they can get to their — to their own —

"A.   Right.

"Q.   — veterinarian? *What if they don't have a veterinarian?*

"A.   *We provide them with a list of all the veterinarians in the area.*

"Q.   *Okay. Do you direct them to any particular veterinarian or just provide a list?*

"A.   *No, we just give them a list.*

"Q.   *Okay. Now does this list include members of the Portland Veterinary Medical Association? [PVMA]*

"A.   *Yes, it does.*

"Q.   Does it also include nonmembers?

"A.   Yes." (Emphasis supplied.)

Taxpayer's Board of Directors is composed of five members who are elected by members of the PVMA. Of all the veterinarians in the Portland area, half were members of PVMA. It is likely that taxpayer's founders and officials derive a private advantage or benefit from the clinic's client referral process for follow-up treatment or care.

Reviewing the record, we have found other factors which deserve comment. Although the initial donation by Lewis to start up the clinic may have been given in the spirit of charity, taxpayer was formed with the expectation that it would be self-sufficient. As a consequence, its fee schedule was, and is, structured to cover all costs. Unlike most charitable corporations, which depend on the receipt of donations for their survival, taxpayer's reliance on such funding is minimal. Although the fact that a corporation makes a profit or charges a fee for its services does not necessarily vitiate its claimed

status as charitable, it is a factor to be considered in the context of the corporation's manner of operation. *Ackerman v. Phys. and Surgeons Hosp., supra,* 207 Or at 665-66.

We also find from the record that it is only when an individual pet owner says that he or she cannot afford payment that any mention of free or discounted services — the taxpayer's alleged principal charitable activity — occurs. Moreover, taxpayer could not offer any specific examples or documentation that it actually provided free services to indigent pet owners. It appears that, in accordance with taxpayer's business procedures, the rendering of free or discounted services occurs only by happenstance, if at all.

Relief of a government burden is also an indicator of giving. This court stated in *Friendsview Manor v. Tax Com.,* 247 Or 94, 105-06, 420 P2d 77, 427 P2d 417 (1967), that one reasonable explanation for the government's decision to exempt charitable enterprises from the payment of taxes is that "if such enterprises did not exist the government would be required to use tax dollars to do the job the charitable enterprises are now doing." *See also Methodist Book Concern v. St. Tax Com'n,* 186 Or 585, 597, 208 P2d 319 (1949). Taxpayer claims that, if relief of a government burden is a factor to be considered, it meets that criterion in that it relieves Multnomah County of a financial and service-related burden by offering small animal examination and treatment services at a rate below its normal fee.

First of all, we are not convinced that, in the absence of taxpayer, the county would feel required to offer similar services. Secondly, the evidence simply does not establish that taxpayer relieves the county of any appreciable burden. Under a contract between taxpayer and the county, taxpayer charges the county $15 for services that other veterinarians, during their hours of operation, provide free of charge. In addition, taxpayer benefits from a service the county provides at no charge, *i.e.,* the removal of dead animals, a service that taxpayer previously paid up to $800 per month to receive. The "relief of a government burden" approach of *Friendsview Manor* is a one-way street: it may help an organization establish it is a charity, but failure to relieve a government burden is not a mark against such an organization. Even as so

viewed, however, it is not a street down which this taxpayer can go. It relieves no government burden.

We acknowledge that taxpayer does meet some of the requirements of a charitable organization. However, while taxpayer's activities are worthwhile and commendable, we cannot say that, in view of all the factors we have examined, taxpayer has carried its burden of qualifying as a "charitable" institution under ORS 307.130.

The Tax Court is affirmed.