IN THE TAX COURT OF THE
STATE OF OREGON

WILLAMETTE EGG FARMS, INC.,
an Oregon corporation

*v.*

DEPARTMENT OF REVENUE

(TC 4134)

Michael E. Farnell, Hagen, Dye, Hirschy & DiLorenzo, P.C., Portland, represented Plaintiff (taxpayer).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented Defendant (department).

Decision for Defendant rendered May 26, 1998.

### CARL N. BYERS, Judge.

In its Motion for Summary Judgment, Plaintiff seeks a determination that equipment used in its brooder houses is directly related and reasonably necessary to the production of fresh shell eggs. The legal issue arises under ORS 307.400(5),[1] which exempts certain agriculturally related equipment from property taxation. The parties submitted briefs and the court has heard oral arguments.

### FACTS

Plaintiff is a large producer, processor, and marketer of fresh shell eggs and maintains approximately 1.3 million laying hens. It is a vertically integrated business, which means that it buys approximately 700,000 to 800,000 day-old chicks per year, raises them in brooder houses until they are mature (about 18 weeks old), and then transfers them to laying houses where they produce eggs until they are approximately two years old. Plaintiff cleans, grades, packages, and markets the eggs.

The specific equipment in question consists of an extensive cage system with automatic feeding, watering, and ventilation systems. This equipment houses the young chickens or "pullets," until they mature and become laying hens.[2]

---

[1] All references to the Oregon Revised Statutes are to 1995.

[2] Although not mentioned in the affidavits, the court also assumes there is an automatic system for waste removal.

The cages are like those used for laying hens, except for features related to the gathering of eggs such as sloped floors and egg conveyors. One purpose in having similar cages is to reduce stress when the pullets are moved from the brooder house to the laying house.

## ISSUE

Is the brooder house equipment used to raise pullets "directly related and reasonably necessary" to the production of fresh shell eggs?

## ANALYSIS

As a starting point, it is well to remember:

"Taxation is the rule and exemption from taxation is the exception. The burden of establishing entitlement to an exemption is on the taxpayer claiming the exemption." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 426-27, 723 P2d 320 (1986) (internal citations omitted).

Although exemption statutes are construed strictly, the court's objective is always to determine legislative intent. *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 817 P2d 1292 (1991). To determine legislative intent, the court must first examine the text and context of the statute. Only if the meaning of the statute is not clear from its text and context does the court consider legislative history or other extraneous information. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

ORS 307.400 exempts from property taxation certain farm animals, inventory, and equipment. The specific provision in question here is ORS 307.400(5)(e), which exempts:

"Equipment used for the fresh shell egg industry that is *directly related and reasonably necessary* to produce, prepare, package and ship fresh shell eggs from the place of origin to market, whether bolted to the floor, wired or plumbed to interconnected equipment, including, but not limited to, grain bins, conveyors for transporting grain, grain grinding

machinery, feed storage hoppers, cages, egg collection conveyors and equipment for washing, drying, candling, grading, packaging and shipping fresh shell eggs." (Emphasis added.)

■ There is no question that the subject property constitutes equipment used by the fresh shell egg industry. However, the legislature used language that requires such equipment to be "directly related *and* reasonably necessary" to produce or process fresh shell eggs. What did the legislature intend by these words? Although, neither term is defined, the statute gives examples: "grain bins, conveyors for transporting grain, grain grinding machinery, feed storage hoppers, cages, egg collection conveyors and equipment for washing, drying, candling, grading, packaging and shipping fresh shell eggs." These examples cover all aspects of the process of producing an egg. However, they do not indicate the extent of the process. To the extent the statute lists various equipment, the initial inquiry must be on whether such equipment is "directly related and reasonably necessary" to the production of eggs. The question becomes, "At what point does the process of producing an egg begin?" Is it when the chicken is placed in the cage and fed, with the expectation of producing an egg? Or, is it when an egg is hatched and a chick emerges?

Plaintiff submitted affidavits indicating that on-site brooder operations are reasonably necessary to the production of eggs. The Affidavit of Gordon Satrum, owner of Plaintiff, indicates that Plaintiff started raising its own laying hens because of problems with purchased hens. The differences in brooder housing and laying cages resulted in excessive mortality when the pullets were moved. In addition, Plaintiff had no control over its grower contractors, resulting in exposure to more diseases. By raising its own pullets, Plaintiff is able to better protect them from disease, assure itself a future stock, and control the quality of care to insure maximum production.

Donald Bell, an expert in egg production, indicates that the rearing of pullets is considered an integral part of egg production. His affidavit states that economic factors dictate the need, not only because of indirect costs, but also to assure a quality laying hen. He states that replacement of

laying hens requires precise timing with regard to ordering new chicks and their rearing.

The Affidavit of H.S. Nakaue, a retired professor who specialized in poultry, indicates that it is necessary to physically separate chicks from laying hens to prevent the spread of disease and that chicks are very susceptible to disease. Also, he indicates that the environment of the brood-grow houses has a major effect on the health and productivity of the laying hens. Therefore, it is important for the producer to control the temperature, lighting, ventilation, and other environmental conditions.

Finally, Gregg J. Cutler, D.V.M., M.P.V.M, serves as a veterinarian for Plaintiff and expresses the opinion that it is necessary to raise replacement pullets for health and quality reasons.

There seems to be little question that the subject equipment is "reasonably necessary" to the production of eggs. For reasons set forth in the affidavits recited above, the industry raises its own laying hens. By doing so, it minimizes the risk of disease, maximizes it production, and assures itself of a supply. Thus, the remaining question is whether the equipment in question is "directly related" to the production of eggs.

Defendant contends that the subject equipment is not "directly related" because it is separated in time and space from egg production. Defendant cites *NW Alliance for Market Equality v. Dept. of Rev.*, 318 Or 129, 134, 862 P2d 1300 (1993), which states:

> " 'Directly' commonly means, among other things, 'without any intervening space or time,' 'without divergence from the source or the original,' 'without any intervening agency or instrumentality or determining influence: without any intermediate step,' * * *."

Plaintiff argues that the statute expressly lists the type of equipment at issue because it is directly related to egg production. Although the statute gives examples of the type of equipment exempted, such equipment must still be "directly related" to the production of eggs. The legislature only noted the type of equipment that would be exempt in the

event it is used for the production of eggs. Thus, an inquiry into the meaning of the phrase is necessary.

■ Both "directly" and "related" are words of common and ordinary usage. "Directly" means in a straight line, without any intervening separation or divergence. "Related" means connected, allied or in some proximity. As applied in this context, "directly related" equipment means equipment that results in the production or processing of fresh shell eggs.

The court finds that the subject equipment results in chickens, not eggs. It is directly related to raising chickens, not producing eggs. The specific items mentioned in the statute, such as grain bins, are directly related only to the extent that the grain is used to feed the laying hens which produce the eggs. If grain is used to feed chicks, then the grain bins are not directly related because the feeding does not directly result in an egg.

The court acknowledges that the statute addresses a process that is made up of a sequence of events. This makes it more difficult to draw the line between what is directly and what is indirectly related. However, it is clear that who performs the function is not relevant. If an independent contractor candled, graded, and packaged the eggs, then the equipment used to perform those functions would be exempt even though separated from and not owned by the egg producer. Similarly, just because Plaintiff determined it was more economical to raise its own pullets, making that process part of the vertically integrated operation, does not make the relationship direct.

■ Equipment used to feed laying hens is directly related to the production of eggs. Equipment used to fertilize seed that grows into grain that is ground into feed for laying hens is not directly related to the production of eggs. Although the equipment may perform an absolutely essential step in the sequence of processes that results in an egg, it is not directly related to the production of an egg.

■ If the court construed "directly related" in the broader sense as contended for by Plaintiff, then any or all of the processes which eventually result in an egg would be

"directly related" to its production. However, that could put the egg before the chicken, since hatching eggs to grow into laying hens is part of the process that results in an egg. It seems to the court that the "reasonably necessary" test includes all equipment used in the chain of production. By using both tests, the legislature must have intended "directly related" to include only that equipment in the chain which directly results in the production of eggs.

In its argument, Plaintiff placed substantial weight on its belief that the legislature intended to restore the prior common practice of exempting brooder houses. The court does not know if this was the practice or not, but as a first matter, *PGE* precludes this court from looking beyond the statute if its words are unambiguous—which they are. However, even if the court were to perform the analysis, an examination of the legislative history does not clearly indicate an intent to exempt brooder houses. If the legislature in fact had such intention, then the statute's two-part test effectively precludes it.

The court concludes that the subject equipment, which is used in brooder houses to raise chicks to maturity, is not exempt under ORS 307.400(5)(e) as equipment "directly related and reasonably necessary" to produce eggs. This determination is dispositive of the issue in this case. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied, and

IT IS FURTHER ORDERED that judgment be entered upholding the Department of Revenue's Opinion and Order Nos. 95-4344 and 95-4345.