IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MATER INVESTMENT COMPANY and ) 
CATHERINE M. MATER, Managing Partner, )
             )
   Plaintiffs,     )  TC-MD 150050N
             )
  v.         )
             )
BENTON COUNTY ASSESSOR,  )
             )
             )
   Defendant.    )  **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered March 7, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appeal Defendant's exemption denial, dated November 24, 2014, for part of property identified as Account 144778 (subject property) for the 2014-15 tax year. A trial was held in the Oregon Tax Courtroom on November 4, 2015, in Salem, Oregon. Catherine M. Mater (Mater), Managing Partner of Mater Investment Company, appeared and testified on behalf of Plaintiffs. Richard Newkirk (Newkirk), Commercial/Industrial Appraiser, and Jenny Anderson (Anderson), Exemption Specialist, each appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 15, 18, and 19 were received without objection. Defendant objected to the relevance of Plaintiffs' Exhibits 16 and 17, appraisals from 2009 and 2010 of the Elements building. The court excluded Plaintiffs' Exhibits 16 and 17. Defendant's Exhibits A through AG were received without objection.

/ / /

/ / /

# I. STATEMENT OF FACTS

A.    *The Subject Property; Leases*

The subject property is a 6,000 square foot commercial office building located in downtown Corvallis.[1]  (Ptfs' Ltr at 1, Oct 26, 2015.)  Mater testified that her family built the subject property in 1980 as an investment and renovated it in 2009.  She testified that the subject property has two unique design features: (1) a larger HVAC system for cooling because the subject property was initially leased to high tech companies; and (2) an on-site parking lot with 17 designated parking spaces for tenants and their employees.  Mater testified that no other downtown office buildings except the Renaissance building have a similar HVAC system.  She testified that the additional cooling capacity is available to potential tenants who need it.  Mater testified that no other downtown office buildings have similar "dedicated" parking.  She testified that downtown riverfront parking is at a premium.  Mater testified that the subject property is located on the riverfront and has a river view.  (*See* Ptfs' Ex 6 at 4-5 (photos).)  She testified that there is no road between the subject property and the river, and that the subject property's view space is spectacular.

Mater testified that she is an engineer in the forest products industry and she works in the field of sustainable natural resource development.  She testified that Plaintiffs have sought to rent to companies and organizations operating in the natural resources industry.  Mater testified that Plaintiffs' tenants are mostly nonprofit organizations recognized by the IRS under IRC section 501(c) and she charges lower rent to those tenants.

Mater testified that Greenbelt Land Trust (Greenbelt), a registered 501(c)(3) nonprofit organization, leased 26 percent of the space in the subject property.  (*See* Ptfs' Ltr at 1, Oct 26,

---

[1] Newkirk wrote that the subject property contained 6,616 square feet of space.  (Def's Ex B at 1.)

2015; Def's Ex P at 3.)  Within the subject property, Greenbelt leased 1,672 square feet of office space and 67 square feet of additional storage space as of April 1, 2014.  (Ptfs' Ex 1 at 6.)  Mater testified that Greenbelt's lease rate was the "nonprofit lease rate."  (*See* Ptfs' Ltr at 1, Oct 26, 2015.)  She testified that Greenbelt received property tax exemptions for its leased space in the subject property in 2007, 2009, 2011, and 2013.[2]  Plaintiffs' 2014 lease with Greenbelt stated: "The 10% non-profit discount stays in effect as long as the tax exemption from Benton County for the leased premises obtained in 2007 remains in effect."  (Ptfs' Ex 1 at 7.)  Under the lease, Plaintiffs are obligated to pay all taxes due on the real property.  (*Id.* at 10.)

Mater testified that, in 2013, Greenbelt's monthly rental rate was $1.44 per square foot. She testified that Greenbelt's rent increased by three percent from 2012 to 2014 to account for cost of living increases.  Greenbelt's total rent in 2014 was $2,468.60 per month, which was comprised of $2,406.29 per month for the office space and $62.31 per month for the storage space.  (Ptf's Ex 1 at 6.)  Mater testified that Greenbelt's lease rate in effect from 2014 to 2016 is $1.48 per square foot per month.  She testified that Greenbelt's lease rate is "gross" or "all inclusive"--it includes utilities, garbage, cleaning, and similar expenses.

Mater testified that Plaintiffs lease two other spaces in the subject property to nonprofit organizations:  Mary's River Watershed Council leases 750 square feet of office space for $1.29 per square foot and Ten Rivers Food Web leases 377 square feet of office space for $1.00 per square foot.  (*See* Ptfs' Ex 3 at 6; Ex 4 at 5.)  Mater testified that Mary's River Watershed Council and Ten Rivers Food Web are both nonprofit organizations recognized by the IRS. Mater testified that the space leased to Mary's River Watershed Council has only one window overlooking the river and the space leased to Ten Rivers Food Web has no windows or natural

---

[2] Mater testified that Greenbelt had to submit a new exemption application in 2014 because it executed a new lease on the subject property.

light.  (*See* Ptfs' Ex 6 at 3 (subject property layout).)  She testified that the different lease rates charged to Greenbelt, Mary's River Watershed Council, and Ten Rivers Food Web reflect the different views from the office spaces leased by each organization.

Mater described the lease rates to Mary's River Watershed Council and Ten Rivers Food Web as "non-profit lease rates."  (Ptfs' Ltr at 2, Oct 26, 2015.)  Neither lease includes any explicit reference to a nonprofit lease rate or a discount for property tax exemption.  (*See* Ptfs' Exs 3, 4.)  Newkirk testified that those leases have not received property tax exemption from Defendant.  (*See* Def's Ex G at 1 (categorizing both leases as typical downtown leases, not exempt leases).)

B.      *The Subject Property's Market*

Mater testified that she considers the subject property's market area to be the downtown riverfront.  She testified that the riverfront has developed as a unique market since around 2007. Mater testified that riverfront properties are rarely vacant.  Newkirk testified that he thinks the presence of homeless people is negatively impacting the riverfront market.  (*See* Def's Ex AG.) He testified that he has had discussions with two landlords of properties located near the subject property about an increase of homeless people in the past year or two.  Mater testified that a homeless camp is located across the river in Linn County.  She testified that the real issue was proposed "damp shelters" that would allow intoxicated individuals to stay in the area.  The shelters would have been on 4th Street, but the proposal was defeated.

Newkirk testified that he found three distinct market segments in the Corvallis downtown central business district office market: (1) exempt leases; (2) typical leases; and (3) newer, high end leases.  (*See* Def's Ex G at 1.)  He arranged his leases into those categories.  (*See id.*)

/ / /

1.      *Plaintiffs' Market Evidence and Comparable Leases*

Mater testified that, if Greenbelt's space in the subject property were leased for profit, the lease rate would be in the range of $1.80 to $2.00 per square foot, gross.  She testified that Plaintiffs originally gave a 10 percent discount to their nonprofit tenants, but in reality the discount has been 20 to 30 percent.

Mater testified that Plaintiff Mater Investment Company owns 1,300 square feet of "second floor commercial office space in the Renaissance building[, which was] constructed in 2008 and [is] located immediately adjacent" to the subject property.  (*See* Ptfs' Ltr at 1, Oct 26, 2015.)  "The remainder of the second floor of the [Renaissance building] is owned by Carone Partnership Ltd (CARONE)."  (*Id.*)  Mater testified that Plaintiffs leased its space to Conservation Biology Institute (CBI) at a rate of $2.24 per square foot, full-service, in 2014.  (*See* Ptfs' Ex 5 at 3.)  She testified that Plaintiff's lease rate to CBI is a nonprofit lease rate.  Plaintiffs' lease to CBI makes no reference to a nonprofit lease rate or a discount for property tax exemption.  (*See* Ptfs' Ex 5.)  Mater testified that Carone also leases space in the Renaissance building to CBI; Carone's lease rate is $2.82 per square foot and is not a nonprofit lease rate.  (*See* Ptfs' Ltr at 2, 4, Oct 26, 2015.)

2.      *Defendant's Market Evidence and Comparable Leases*

Newkirk identified leases and listings within each of the three market segments he identified in the Corvallis downtown central business district office market.  (*See* Def's Ex B at 2; G at 1.)  He listed both "effective gross" rent and "NNN" (triple net) rent for each of his comparable leases and listings.  (*See* Def's Ex G at 1.)  Newkirk testified that he adjusted the triple net leases to gross using a 75 percent of gross adjustment.  (*See id.*)

/ / /

a.      Exempt Leases

Newkirk identified 10 "exempt leases," one of which was Greenbelt's lease of the subject property.  (*See* Def's Ex G at 1.)  Newkirk testified that he only included leases in the "exempt" category if the property had received a property tax exemption from Defendant; he did not include a property simply because it was leased to a nonprofit organization.  He testified that he did not include the property leased by Carone to CBI in the exempt category because it does not receive a property tax exemption; he put that lease in the "high end" category.  (*See id.*) Newkirk testified that he was not aware of Plaintiffs' lease to CBI.  He testified that exempt lease 9 included some dedicated parking, but maybe not enough for all of the tenant's employees.  (*See id.*)  Newkirk testified that the exempt leases he used ranged from $6.68 to $20.68 per square foot, gross.  (*See id.*)  On a per-month basis, that range is $0.56 to $1.72 per square foot.

Newkirk provided a copy of the lease for each of his exempt leases.  (*See* Def's Ex I through R.)  Relevant details of each exempt lease is set forth in the following table:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

| Lease | Size (SF)[3] | Rent/Mo. | Rent/ Yr. | Expenses[4] | Tax/SF[5] | Lease date | Ex |
|---|---|---|---|---|---|---|---|
| 1 | 6,124 | $0.54 | $6.52 | NNN | $0.15 | Jan 1, 2011 | I |
| 2 | 2,340 | $0.82 | $9.89 | NNN | $0.80 | Apr 4, 2011[6] | J |
| 3 | 2,237 | $1.33 | $15.96 | Gross | $1.71 | Sept 1, 2011 | K |
| 4 | 9,809 | $0.88 | $10.59 | NNN | $1.13 | Jan 1, 2012 | L |
| 5 | 4,750[7] | $1.43 | $17.16 | Gross | $1.82 | Mar 16, 2006 | M |
| 6 | 3,280 | $1.56 | $18.67 | NNN | $2.55 | Jan 11, 2002 | N |
| 7 | 894 | $0.78 | $9.39 | Mod gross | $1.35 | Mar 10, 2014 | O |
| 8[8] | 1,672 | $1.48 | $17.72 | Gross | $1.53 | Apr 1, 2014 | P |
| 9 | 2,350 | $1.18 | $14.10 | Mod gross | $2.24 | Jun 30, 2010 | Q |
| 10 | 1,400 | $0.50 | $6.00 | NNN | $0.85 | Mar 1, 2007 | R |

With the exception of exempt leases 1, 5, and 10, the rental rates stated are as of 2014. The lease 1 rental rate was as of January 2011; the lease 5 rental rate was as of March 2006; and the lease 10 rental rate was as of March 2007. (*See* Def's Exs I, M, R.)

> b. Typical Downtown Leases and Listings

In his "typical downtown listings and leases" category, Newkirk identified six listings and two leases. (*See* Def's Ex G at 1.) Newkirk testified that he included Plaintiffs' leases to Mary's River Watershed Council and Ten Rivers Food Web in that category. (*See id.*) Those leases are the only two leases in that category; the rest are listings. (*See id.*) Newkirk testified

---

[3] For the sizes of exempt leases 2, 7, and 10, see Def's Ex G at 1.

[4] A "gross lease" is one "in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called *full-service lease*." *Appraisal Institute, Dictionary of Real Estate Appraisal* 91 (5th ed 2010). A "modified gross lease" is one "in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expense varies among modified gross leases, expense responsibility must always be specified." *Id.* at 127. A "triple net lease," or "a net net net lease," is one "in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management." *Id.* at 134, 200.

[5] Tax per square foot per year is listed in Def's Ex G at 1; *see also* Def's Ex Q at 2, 7 (cover letter to exempt lease 9 expressly states the amount of the property tax reduction due to exemption).

[6] Lease was amended March 13, 2014, with rent established at $1,794 per month. (Def's Ex J at 14.)

[7] The lease size and rental rates listed are for the first floor of this property; the lease also included 1,600 square feet of "lower level" space rent at $1.13 per square foot per month and 3,950 square feet of "mezzanine" space rented at $1.33 per square foot per month. (Def's Ex M at 2.)

[8] Comparable lease 8 is the subject property leased to Greenbelt.

that annual rents for "typical downtown listings and leases" ranged from $9.43 to $21.60 per square foot, gross. (*See id.*) On a per month basis, that range is $0.79 to $1.80 per square foot.

Newkirk's typical listing 1 was $1,000 per month for 700 square feet of professional office space with on-site parking. (Def's Ex S.) That asking rent is $1.43 per square foot per month, or $17.16 per square foot per year, gross. (*See id.*) Newkirk's typical listing 2 was for a variety of office spaces ranging from 366 to 6,000 square feet, with rates "starting at" $1.00 per square foot per month, full service. (Def's Ex T.) Newkirk's typical listing 3 was 3,000 square feet of professional office with on-site parking with rates "starting at" $1.25 per square foot per month, triple net. (Def's Ex U.) Newkirk's typical listing 4 was 3,000 square feet of class B office built in 1951, with an annual asking rent of $16.20 per square foot, triple net. (Def's Ex V.) That asking rent is $1.35 per square foot per month. (*See id.*) Newkirk's typical listing 5 is a sublease of 2,000 square feet of commercial space "[l]ocated inside Mother Goose Resale." (Def's Ex X.) The asking rent is $2,300 plus electricity for a month-to-month lease, or $2,000 plus electricity for a one year lease. (*Id.*) That is $1.15 per square foot per month for a month-to-month lease. (*See id.*) Newkirk's typical listing 6 is a two-story, 3,904-square foot "commercial space" that includes a "[l]arge storage area." (Def's Ex Y.) Asking rent is $2,300, or $0.59 per square foot. (*See id.*) No expense structure or proposed lease terms are identified. (*Id.*)

c.      High End Leases and Listing

In his "high end" category, Newkirk identified five leases and one listing. (*See* Def's Ex G at 1.) Newkirk testified that the high end properties were all newer, built in 2001 or later. (*See id.*) He testified that several were located within the Renaissance and Elements buildings. (*See id.*) Newkirk testified that the high end properties are multiuse properties located on the

river, typically with six or seven stories and unique attributes. He testified that some have underground parking. Newkirk testified that, although the Renaissance and Elements buildings are on the riverfront, they lack a river view from the ground floor commercial spaces. Newkirk testified that rents for high end properties ranged from $23.40 to $36.00 per square foot, gross, with an average of $28.02 per square foot. (*See id.*) On a per month basis, that range is $1.95 to $3.00 per square foot, with an average of $2.34 per square foot.

    d.   Greenbelt's Lease of the Subject Property

Newkirk testified that Greenbelt's lease rate is in the top 10 percent of the exempt leases and at the bottom of the range of high end leases. He testified that the subject property is located next door to his high end leases 1 and 2, but he does not consider the subject property part of the high end category because it was built in 1980. Newkirk testified that, in his view, the subject property commands a lease rate of $13 to $15 per square foot, gross. On a per month basis, that range is $1.08 to $1.25 per square foot.

    3.  *Plaintiffs' Rebuttal*

Mater testified that Newkirk failed to properly account for triple net leases as compared with gross or full service leases. She testified that Newkirk misunderstood the for-profit vs. nonprofit market, noting that he included leases to nonprofit organizations among his for-profit lease categories. Mater testified that several of Newkirk's exempt leases are not comparable to the subject property: exempt lease 1 is industrial warehouse space, not office space, and exempt leases 2, 7, and 10 are houses converted to office space. (*See* Def's Exs I, J, O, R.) She testified that Newkirk used the basement rental rate rather than the first floor rental rate for his exempt lease 5. (*See* Def's Ex G at 1, Ex M at 1-3.) She testified that Newkirk's high end lease listing 6 in the Jax, was triple net, not gross. (*See* Def's Ex W.) That listing was for $1.65 per square foot

per month, or $19.80 per square foot per year. (*See id*.) Mater testified that the Jax has parking

for residential condo owners, but not for commercial tenants. Newkirk disagreed.

Mater testified that she thinks the subject property competes with the Renaissance and the

Elements buildings insofar as the subject property is located on the river, but she agrees with

Newkirk that there are relevant differences between the subject property and those buildings.

## II. ANALYSIS

A.     *Motion to Dismiss*

Defendant filed a motion to dismiss (motion) in its Answer, arguing that Plaintiffs are not

aggrieved under ORS 305.275(1).[9] (Def's Answer at 1.) The parties submitted written

arguments on Defendant's motion. On July 1, 2015, the court entered an Order concluding that

Plaintiffs are aggrieved under ORS 305.275(1) and denying Defendant's motion. The court's

Order entered July 1, 2015, is hereby incorporated in this Decision.

B.     *Property Tax Exemption*

The issue presented is whether the subject property lease to Greenbelt qualifies for

property tax exemption under ORS 307.112 for the 2014-15 tax year.

ORS 307.112 allows a property tax exemption for property owned by a "taxable owner"

and leased to an organization entitled to property tax exemption under ORS 307.090, 307.130,

307.136, 307.140, 307.145, 307.147, or 307.181(3) if certain requirements are met:

> "(a) The property is used by the lessee * * * in the manner, if any, required by
> law for the exemption of property owned, leased, subleased or being purchased by
> it; and
>
> "(b) It is expressly agreed within the lease * * * that the rent payable by the * * *
> organization * * * has been established to reflect the savings below market rent
> resulting from the exemption from taxation."

---

[9] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

ORS 307.112(1).[10]

> "If the assessor is not satisfied that the rent stated in the lease * * * has been established to reflect the savings below market rent resulting from the tax exemption, before the exemption may be granted the lessor must provide documentary proof, as specified by rule of the Department of Revenue, that the rent has been established to reflect the savings below market rent resulting from the tax exemption."

ORS 307.112(3).

Plaintiffs bear the burden of proof and must prove their case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). In property tax exemption cases, "[t]axation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 426, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 88-89, 817 P2d 1292 (1991). "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." *North Harbour Corp. v. Dept. of Rev.*, 16 OTR 91, 95 (2002).

It is clear under ORS 307.112 that the benefit of the property tax exemption must flow to the lessee, the organization entitled to exemption. The benefit of the property tax exemption is not intended for the taxable owner. The lease expense structure--triple net or gross--is an important consideration in determining whether the tax savings from exemption flow to the tenant or the landlord. *See e.g., Four Rivers Community School, Inc. v. Malheur County*

---

[10] There is no dispute in this case that the subject property was leased to and used by Greenbelt, an organization entitled to property tax exemption under ORS 307.130.

*Assessor*, TC-MD 040924E, WL 1432552 at *3 (May 12, 2005) (concluding the requirements of ORS 307.112 are satisfied by a triple net lease, assuming the lease rate is not above market, because "the landlord experiences no tax savings" under a triple net lease. "With a gross lease, the landlord bears the burden of the property tax expense. If the property becomes exempt, the landlord no longer pays that expense."). Greenbelt's lease of the subject property is gross. Thus, Plaintiffs (the lessor) would receive the benefit of Greenbelt's property tax exemption unless the lease rate is sufficiently below market rent to reflect the savings from the exemption.

1. *The Subject Property Lease*

ORS 307.112(1)(b) requires that the lease expressly state that the rent payable "has been established to reflect the savings below market rent result from the exemption from taxation." Greenbelt's lease states that "[t]he 10% non-profit discount stays in effect as long as the tax exemption from Benton County for the lease premises obtained in 2007 remains in effect." (Ptfs' Ex 1 at 7.) Thus, the express language of Greenbelt's lease references a reduced rental rate contingent upon Greenbelt's property tax exemption. That language is sufficient to satisfy the requirements of ORS 307.112(1)(b). However, Defendant disagrees that the rent stated in Greenbelt's lease "has been established to reflect the savings below market rent resulting from the tax exemption[.]" ORS 307.112(3). Under those circumstances, Plaintiffs are required to provide documentary proof as specified by the Department of Revenue's administrative rule. *Id.*

2. *The Department of Revenue's Applicable Administrative Rule*

The Department of Revenue's administrative rule promulgated pursuant to ORS 307.112, states in pertinent part,

"(5) The assessor must be satisfied that the amount of rent charged is below market rent. 'Market rent' is defined as the rental income a property would most probably command in the open market and includes an element for property taxes.

"(6) To reflect the savings below market rent, the actual rent must be less than market rent in an amount that is at least equal to what the property tax would be if the property were taxable.

"* * * * *

"(8) Acceptable documentary proof to show the property tax savings is passed on to the lessee may include but is not limited to the following comparisons:

"(a) Current rental rate for any portion of that property occupied by nonexempt tenants;

"(b) Historic rental rate data of that property;

"(c) Rental rate used in a real market value appraisal for that property;

"(d) Rent study of comparable or similar properties.

"(9) The savings must be clearly evident. Insufficient proof or failure to show the rent is below market rent as described above is grounds for denial of the exemption.

"(10) A statement that the 'lessee is responsible for the taxes' is not sufficient proof of a tax savings."

OAR 150-307.112.

Of the types of documentary proof identified in OAR 150-307.112(8)(c), the court received evidence of all but the "rental rate used in a real market value appraisal for that property." The court will review the evidence presented under the other types of proof listed in the rule.

a.     Current Rental Rates for Portions of the Subject Property Occupied By Nonexempt Tenants

Portions of the subject property are leased to two other tenants: Mary's River Watershed Council and Ten Rivers Food Web. Both of those tenants are nonprofit organizations and Mater described their lease rates as "non-profit lease rates." (Ptfs' Ltr at 2, Oct 26, 2015.) Neither lease expressly references a nonprofit discount or rate and neither space has received a property

tax exemption. Mater's testimony suggests that Plaintiffs provide a reduced rental rate to nonprofit organizations whether or not they receive property tax exemption. Plaintiffs' commitment to providing reduced rates to nonprofit organizations is laudable, but it undermines Mater's assertion that Greenbelt's lease rate was "established to reflect the savings below market rent *resulting from* the tax exemption[.]" ORS 307.112(3) (emphasis added). If Plaintiffs provide the same rent discount to all of their nonprofit tenants regardless of whether those tenants receive property tax exemptions, it is difficult for the court to conclude that the reduction in Greenbelt's rent is due to its property tax exemption. That said, Greenbelt's lease expressly references a 10 percent nonprofit discount, whereas none of Plaintiffs' other leases reference a discount or reduced rental rate. If Plaintiffs' other tenants receive a rent discount, the court cannot determine the amount.

Plaintiffs' lease rates to Mary's River Watershed Council and Ten Rivers Food Web are both less than Greenbelt's lease rate. Mater testified that the different lease rates are attributable to differences in the layout of the subject property's office spaces. Greenbelt enjoys river views and natural light, whereas Mary's River Watershed Council has only one window and Ten Rivers Food Web has no windows or natural light. The fact that other spaces within the subject property are leased for less than the space leased to Greenbelt tends to weigh against a finding that Greenbelt's lease rate is below market. However, Mater provided a reasonable explanation for the differences in rent charged for different spaces within the subject property.

b.      Historic Rental Rate Data of the Subject Property

Greenbelt received property tax exemptions from Defendant for its leased space in the subject property in 2007, 2009, 2011, and 2013. Greenbelt's monthly rental rate was $1.44 per square foot in 2013. Mater testified that Plaintiffs increased that rate to $1.48 per square foot in

2014 to account for cost of living increases. She testified that Greenbelt's rent increased three percent from 2012 to 2014. The increase in Greenbelt's rental rate from 2013 to 2014 is reasonable in light of Mater's explanation. No evidence was presented to indicate that the subject property has ever been leased to a for-profit organization. As a result, the court has no way to compare Greenbelt's lease rate with the rate paid by a for-profit tenant for the same space. The evidence of historical rental rate data for the subject property is inconclusive.

c.      Rent Studies of Comparable or Similar Properties

Newkirk provided evidence from the Corvallis downtown market of exempt leases, "typical" lease listings, and "high end" leases and one listing. Of Newkirk's exempt leases, the court gives no weight to exempt leases 1, 2, 6, 7, and 10 because they are not comparable to the subject property. Exempt lease 1 is warehouse space and exempt leases 2, 7, and 10 are houses converted to offices. Exempt lease 6 is a long term lease that started in 2002, so it has little relevance to the 2014 market. The court finds that exempt leases 3, 4, 5, and 9 are the most similar to the subject property, and indicate a lease rate range of $1.17 to $1.43 per square foot per month, gross.[11] Greenbelt's lease rate of $1.48 per square foot per month is slightly above that range. However, exempt leases 3, 4, 5, and 9 started in September 2011, January 2012, March 2006, and June 2010, respectively. Those lease rates may be lower than Greenbelt's in part due to different market conditions as compared to 2014.

Newkirk presented evidence of lease listings from what he described as the "typical" downtown office market. Listings are not actual leases, so they provide the court with only limited help in determining market rent. Of the typical listings Newkirk provided, the court gives no weight to listings 5 and 6 because they are not comparable to the subject property.

---

[11] Exempt lease 4 is $0.88 per square foot per month triple net. Applying Newkirk's adjustment for triple net leases (75 percent of gross) indicates an adjusted rate of $1.17 per square foot per month, gross.

Listings 5 and 6 are both described as "commercial space" and it is unclear whether either includes office space. Listing 5 is a sublease. Neither listing identified the expense structure. Listings 1, 2, 3, and 4 are for professional office space and are roughly comparable to the subject property. They indicate a rent range of $1.00 to $1.80 per square foot per month, gross.[12] Listings 2 and 3 ($1.00 and $1.67 per square foot per month) are both presented as "starting at" rental rates, suggesting that parts of those properties rent for more than the stated asking rate.

Greenbelt's lease rate of $1.48 per square foot is within the range of Newkirk's typical lease listings. If Greenbelt's lease rate were adjusted to include property taxes, it would be $1.61 per square foot per month, which is still in the middle of the typical lease listing range.[13]

Greenbelt's lease rate is below the rental range of Newkirk's high end leases and listing, which ranged from $1.95 to $3.00 per square foot per month, gross. Even if the property taxes are added to Greenbelt's lease rate, the resulting lease rate of $1.61 per square foot per month is below the range of high end leases and listings. That is consistent with Mater and Newkirk's testimony that the subject property is inferior to the high end properties identified by Newkirk.

Greenbelt's actual lease rate is at the high end of the exempt lease rate range, within the range of similar lease listings, and below the range of high end leases. When Greenbelt's actual lease rate is adjusted to include a property tax element, the resulting rate is within the range of office lease listings and below the range of high end leases, suggesting it is "market rent." *See* OAR 150-307.112(5). That leads the court to find that Greenbelt's actual lease rate is sufficiently below its market rent to account for the property tax reduction resulting from

---

[12] Typical listings 3 and 4 are $1.25 and $1.35 per square foot per month, triple net. Applying Newkirk's adjustment for triple net leases (75 percent of gross) indicates adjusted rates of $1.67 and $1.80 per square foot per month, gross.

[13] Newkirk reported that the subject property's tax is $1.53 per square foot per year, which is $0.13 per square foot per month. Adding that amount to Greenbelt's lease rate of $1.48 per square foot per month results in a rental rate of $1.61 per square foot per month with taxes.

exemption. *See* OAR 150-307.112(6). The court concludes that Greenbelt's lease of space within the subject property is entitled to property tax exemption under ORS 307.112.

### III. CONCLUSION

After careful consideration of the testimony and evidence presented, the court finds that Greenbelt's lease rate for space within the subject property has been established to reflect the savings below market rent resulting from the property tax exemption, and is therefore entitled to property tax exemption under ORS 307.112 for the 2014-15 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Defendant's motion to dismiss is denied.

IT IS FURTHER DECIDED that Plaintiffs' appeal is granted.

Dated this ____ day of March 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on March 24, 2016.*